**IN THE CIRCUIT COURT OF THE TWENTY-SECOND JUDICIAL CIRCUIT**
**CITY OF ST. LOUIS**
**STATE OF MISSOURI**

**ROBERTO AVILA,**

***Plaintiff,***

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**,

**GLENN BOYCE,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

**HOUSTON DAVIS,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

**SAM EDWARDS,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

**DOUG GIROD,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

**THOMAS JOHNSON,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

**BRIAN NOLAND,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

**MEREDITH PAGE,**
*in her official capacity as a member of the NCAA Division I Board of Directors,*

**CHRISTOPHER PIETRUSZKIEWICZ,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

Case No. ________

**MARK REED,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

**PHILIP ROGERS,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

**QUINTON ROSS,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

**BRIAN SANDOVAL,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

**TIM SANDS,**
*in his official capacity as a member of the NCAA Division I Board of Directors,*

**LEAH BROWN, MD,**
*in her official capacity as a voting member of the NCAA Board of Governors,*

**ALLISON FEASTER,**
*in her official capacity as a voting member of the NCAA Board of Governors,*

**DOUG GIROD,**
*in his official capacity as a voting member of the NCAA Board of Governors,*

**ADAOBI NEBUWA,**
*in her official capacity as a voting member of the NCAA Board of Governors,*

**DARRYLL PINES,**
*in his official capacity as a voting member of the NCAA Board of Governors,*

**JIM TROHA,**
*in his official capacity as a voting member of the NCAA Board of Governors,*

**SANDRA WOODLEY,** )
*in her official capacity as a voting* )
*member of the NCAA Board of Governors,* )
)
and )
)
**CHARLES BAKER JR.,** )
*in his official capacity as a member* )
*of the NCAA Division I Board of Directors,* )
)

***Defendants.***

**PLAINTIFF'S MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION .... 1

II. KEY FACTS .... 5

III. LEGAL STANDARD .... 7

IV. ARGUMENT .... 8

A. Irreparable Harm .... 8

B. Balancing of Harm Weighs in Mr. Avila's Favor .... 12

C. Likelihood of Success on the Merits .... 13

i. Breach of Contract and Duty of Good Faith and Fair Dealing .... 13

ii. Violation of Missouri Antitrust Law .... 18

iii. Violation of Missouri Student-Athlete NIL Rights (§ 173.280) .... 19

iv. Tortious Interference with Contractual Relationships and Business Expectancy .... 19

D. Public Interest .... 20

V. THE REQUESTED ORDER IS NARROWLY TAILORED .... 21

VI. SECURITY BOND .... 22

VII. REQUEST FOR EMERGENCY RELIEF .... 23

VIII. CONCLUSION .... 24

# TABLE OF AUTHORITIES

## Cases

*ACLU of Mo. v. Ashcroft*, 577 S.W.3d 881 (Mo. Ct. App. 2019)....................................................7

*Adams et al. v. NCAA*, Case No. CV-2026-1757 (Tulsa Cty., Okla. Sept. 16, 2026)...........2, 8, 13

*Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009)............................................8

*Comprehensive Health of Planned Parenthood Great Plains v. State*, 726 S.W.3d 716 (Mo. Ct. App. 2025)....................................................................................................7, 12

*Comprehensive Health of Planned Parenthood Great Plains v. State*, 729 S.W.3d 222 (Mo. 2025) ........................................................................................................................7

*Daley et al. v. NCAA*, Cause No. 53C06-2609-PL-002418 (Monroe Cir. Ct., Ind., Sept. 23, 2026) ...................................................................................................................2, 15

*Dobson v. NCAA,* Case No. 26BA-CV05086 (Boone Cty., MO Sept. 18, 2026).......................2, 8

*Drury v. Missouri Youth Soccer Ass'n, Inc.*, 259 S.W.3d 558 (Mo. Ct. App. 2008)............... 15-16

*Elad v. NCAA*, No. 25-1981, 2025 WL 1202014 (D.N.J. Apr. 4, 2025), *vacated and remanded on other grounds*, 160 F.4th 407 (3d Cir. 2025).....................................................9

*Ganden v. NCAA,* No. 96 C 6953, 1996 U.S. Dist. LEXIS 17368 (N.D. Ill. Nov. 19, 1996) ................................................................................................................... 8-9

*Gee v. NCAA*, No. ____, Order (22d Jud. Cir. Sept. 11, 2026) ...................................................22

*Gee v. NCAA*, No. 2622-CC 13351, Order (22d Jud. Cir. Sept. 11, 2026)....................................2

*Griffen v. NCAA*, Case No. 26-002713-CV-272 (Brazos Cty., TX, Sept. 14, 2026)....................11

*Hardware Ctr., Inc. v. Parkedge Corp.*, 618 S.W.2d 689 (Mo. Ct. App. 1981) ..........................13

*Hilliker Corp. v. Watson Prop., LLC*, 667 S.W.3d 117 (Mo. Ct. App. 2022) .............................13

*House v. NCAA*, No. 4:20-cv-03919-CW (N.D. Cal. June 6, 2025)...............................................9

*L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247 (Mo. banc 2002) ......................................................................................................................13

*Mabins v. Missouri State High Sch. Activities Ass'n by & through Bd. of Directors*, 732 S.W.3d 169 (Mo. Ct. App. 2026)..........................................................................16

*Minana v. Monroe*, 467 S.W.3d 901 (Mo. Ct. App. 2015)...........................................................7

*Minton v. Steakley*, 466 S.W.2d 441 (Mo. App. 1971) ....................21

*Mo. Baptist Convention v. Carnahan*, 170 S.W.3d 437 (Mo. Ct. App. 2005)....................14

*Ohio v. NCAA*, 706 F. Supp. 3d 583 (N.D.W. Va. 2023) ....................9

*Osueke v. NCAA*, Case No. 2026-2341-3 (McLennan Cty., Tex. Sept. 22, 2026) ....................14

*Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024) ....................1, 17

*Rock Port Mkt., Inc. v. Affiliated Foods Midwest Coop., Inc.*, 532 S.W.3d 180 (Mo. App. W.D. 2017)....................14

*Smith v. Western Electric Co.*, 643 S.W.2d 10 (Mo. App. 1982) ....................10

*State ex rel. Ideker, Inc. v. Grate*, 437 S.W.3d 279 (Mo. Ct. App. 2014) ....................11

*State ex rel. Missouri State High Sch. Activities Ass'n v. Schoenlaub*, 507 S.W.2d 354 (Mo. banc 1974).................... 15-16

*Tatum v. NCAA*, 992 F. Supp. 1114 (E.D. Mo. 1998) ....................8

*Tettamble v. NCAA*, No. 2622-CC13295, Order (22d Jud. Cir. Sept. 1, 2026) ....................*Passim*

**Statutes**

Missouri Antitrust Law ....................4, 17

Missouri's Student Athlete Compensation Act....................*Passim*

Mo. Rev. Stat. § 173.280 ....................19

Mo. Rev. Stat. § 416.031 ....................17, 23

Mo. Rev. Stat. § 416.141 ....................17

Mo. Rev. Stat. § 527.010 ....................4

Sherman Act....................17

## I. INTRODUCTION

1. Plaintiff Roberto Avila, a student-athlete currently enrolled at Saint Louis University, by counsel, respectfully moves this Court pursuant to Missouri Rule of Civil Procedure 92.02 and the Court's inherent equitable authority for an Emergency Temporary Restraining Order and Preliminary Injunction prohibiting Defendants from enforcing the NCAA's arbitrary and anticompetitive exclusion of the high school class of 2022 from the five-season eligibility framework and from taking any action that would prevent Mr. Avila from practicing with, receiving athletics-related benefits from, maintaining a roster position at, or competing for Saint Louis University or another NCAA member institution during the 2026-27 athletic season.[1]

2. Mr. Avila asks this Court only for what the NCAA already gives to virtually every other athlete: a fifth season of eligibility. Without emergency relief, the 2026-27 season will begin without him, roster spots will be filled, and his collegiate basketball career – along with his professional aspirations and earning potential – will be irreparably foreclosed.

3. Mr. Avila does not dispute that the NCAA may create eligibility rules. But rulemaking power has limits – and when those rules apply to half a million student-athletes and dictate the ability to earn compensation and an education, they must be implemented and applied fairly. Since the high school class of 2016, the NCAA has permitted virtually every Division I athlete to compete for five seasons. And in June 2026, the NCAA codified this five-season rule permanently going forward. Yet the NCAA ***purportedly*** carved out a single, inexplicable exception: athletes who graduated high school in 2022, like Mr. Avila. The players who came before received five seasons through COVID-era waivers and the *Pavia* Waiver. The players who come after will receive five seasons under the new permanent rule. But Mr. Avila and his class –

[1] Mr. Avila expressly incorporates by reference his Verified Complaint and Petition for Emergency Relief.

the one class that bore the full brunt of competing against older, COVID-waivered opponents – are arbitrarily excluded. The NCAA has thereby violated its contractual obligations, tortiously interfered with Mr. Avila's prospective economic advantages, and violated Missouri public policy.

4. Courts around the country, including this Court, have enjoined the NCAA's arbitrary application of the class of 2022 exclusion.[2] Indeed, on September 23, 2026, a state court in Indiana (the NCAA's headquarters) granted approximately one hundred (100) student athletes a preliminary injunction – finding that the NCAA has breached the NCAA Manual by excluding these athletes – and granting these student athletes eligibility to play in the 2026-27 season. *Daley et al. v. NCAA*, Cause No. 53C06-2609-PL-002418 (Monroe Cir. Ct., Ind., Sept. 23, 2026) (Order attached hereto as Exhibit A).

5. Plaintiff requests immediate relief because the 2026-27 athletic season is time-sensitive and cannot be restored once lost. Each day that Plaintiff is prevented from participating causes irreparable harm to his athletic career, education, scholarship and NIL opportunities, professional opportunities, and ability to compete at the collegiate level.

6. Mr. Avila is an elite college basketball player who played the last two seasons at Saint Louis University, earned the A-10 Player of the Year award, led SLU to a top-25 ranking and an NCAA Tournament victory, and is currently enrolled at Saint Louis University pursuing a Master's degree in Leadership and Organizational Development. Mr. Avila has been deprived of his fifth season of eligibility through the NCAA's arbitrary exclusion of the high school class of 2022 from the permanent five-season rule.

[2] *Tettamble v. NCAA*, No. 2622-CC13295, Order (22d Jud. Cir. Sept. 1, 2026); *Gee v. NCAA*, No. 2622-CC 13351, Order (22d Jud. Cir. Sept. 11, 2026); *Dobson v. NCAA,* Case No. 26BA-CV05086 (Boone Cty., MO Sept. 18, 2026) (Temporary Restraining Order, attached hereto as Exhibit B); *Adams et al. v. NCAA*, Case No. CV-2026-1757 (Tulsa Cty., Okla. Sept. 16, 2026) (**Preliminary Injunction Order, attached hereto as Exhibit C)**

7. Mr. Avila has competed in four seasons of collegiate basketball (2022-23, 2023-24, 2024-25, and 2025-26). He did not redshirt during any of those seasons. His five-year eligibility clock does not expire until the end of the 2026-27 academic year. Although the prior framework nominally provided athletes with a five-year clock to compete for four seasons, in practice the NCAA has permitted all student-athletes beginning with the high school class of 2016 to compete for five seasons – all student-athletes except Mr. Avila and his class.

8. In April 2026, the NCAA announced a permanent five-season eligibility framework, replacing the prior **"Four-in-Five"** rule with the new "**Five-in-Five**" rule. Under the new framework, student-athletes are permitted five seasons of competition within a five-year period. However, in June 2026, the NCAA carved out an exclusion for the high school class of 2022, denying those athletes – and only those athletes – the benefit of the fifth season.

9. ***Critically, the 2026-27 NCAA Division I Manual itself provides for five seasons of competition for all student-athletes, with no written exclusion for the high school class of 2022***. The Manual's plain text contains no language limiting the five-season framework based on an athlete's high school graduation year. If the Manual does not exclude the class of 2022, then the NCAA's informal guidance and administrative determinations contradict its own governing document and constitute a clear breach of the NCAA's contractual obligations.

10. Plaintiff has received offers from several NCAA Division I schools that want him on their roster, have open roster spots for him, and are prepared to offer him substantial compensation – all contingent upon him being eligible for the 2026-27 season.

11. Plaintiff also seeks a restraint of the NCAA's roster limit for the 2026-27 season. SLU's coaches have informed Mr. Avila and his representatives that they want him on the team

for next season and have substantial compensation to offer Plaintiff,[3] but SLU was required to finalize its roster for the 2026-27 season due to the NCAA's late and continued exclusion of Mr. Avila. The NCAA's 15-player roster limit is currently preventing Plaintiff from being added to SLU's roster – a prohibition and problem caused by the NCAA itself. Had the NCAA never excluded Mr. Avila's class from the Five-in-Five Rule, Mr. Avila would be on the SLU roster right now for the 2026-27 season. *See* attached as Exhibit D the declaration of Roberto Avila. To be clear, while the roster-limit restraint is necessary for Mr. Avila to return to SLU specifically, eligibility relief alone will independently benefit Mr. Avila because, as set forth above, several other Division I schools want him on their rosters and have open roster spots available for him.

12. Unless injunctive relief is granted by this Court, Avila will lose development, training, team participation, conditioning, games, roster opportunities, scholarship and NIL opportunities, NBA evaluation opportunities, and other competitive opportunities. These losses are irreparable and cannot be restored by a later monetary award.

13. Mr. Avila does not ask for additional years; he asks for equal years. He does not ask for special treatment; he asks for equal treatment.

14. As set forth in the Verified Complaint, Plaintiff asserts claims for: (a) breach of contract as a third-party beneficiary of the NCAA Manual; (b) breach of the implied covenant of good faith and fair dealing; (c) violation of the Missouri Antitrust Law, Mo. Rev. Stat. § 416.031 et seq.; (d) violation of Missouri's Student Athlete Compensation Act, Mo. Rev. Stat. § 173.280;

---

[3] *See* attached as Exhibit H the Declaration of SLU Head Coach Josh Schertz ("Schertz Decl."), which was initially submitted in connection with Mr. Avila's lawsuit against the NCAA in Cook County, Illinois, which was dismissed solely on grounds of lack of personal jurisdiction, with express permission to re-file in another jurisdiction. In dismissing the complaint for lack of personal jurisdiction, the Court held that personal jurisdiction would likely exist "if he were enrolled at or rostered by an Illinois member institution whose participation the challenged rule forecloses" – *i.e.,* here in Missouri.

(e) tortious interference with contractual relationships; (f) tortious interference with business expectancies; and (g) declaratory judgment pursuant to Mo. Rev. Stat. § 527.010 et seq.

## II. KEY FACTS

15. Mr. Avila graduated from Oak Forest High School in 2022 and committed to play Division I basketball at Indiana State University. During his freshman season (2022-23), he earned Missouri Valley Conference All-Freshman Team honors; as a sophomore (2023-24), he helped lead Indiana State to a 32-7 record. He subsequently transferred to Saint Louis University to follow his head coach, Josh Schertz. During his senior season at SLU (2025-26), Mr. Avila was named Atlantic 10 Conference Player of the Year and helped lead SLU to the NCAA Tournament, where SLU defeated Georgia before falling to eventual national champion Michigan. Mr. Avila obtained his bachelor's degree in Communications from SLU and is currently enrolled at SLU for the 2026-27 academic year, pursuing a Master's degree in Leadership and Organizational Development. (Compl. ¶¶ 3–10, 66–77.)

16. Mr. Avila has competed in four seasons of collegiate basketball (2022-23 and 2023-24 at Indiana State; 2024-25 and 2025-26 at SLU). He did not redshirt during any season. His five-year eligibility clock does not expire until the end of the 2026-27 academic year. (Compl. ¶¶ 75–77.)

17. In June 2026, the NCAA announced a permanent "Five-in-Five" rule that eliminated the prior four-season cap and grants all student-athletes five seasons of competition within a five-year period. However, the NCAA carved out a single exception: athletes who graduated high school in 2022 and did not sit out a full season are denied the benefit of the new rule. Mr. Avila falls squarely within that excluded class. (Compl. ¶¶ 13, 106–113.)

18. The 2026-27 NCAA Division I Manual – the authoritative governing document for the upcoming season – provides five seasons of competition for all student-athletes. The Manual's plain text contains no provision, bylaw, annotation, or other language that excludes the high school class of 2022 from the five-season framework. The NCAA's purported exclusion exists only in informal guidance documents, website FAQs, and administrative communications – not in the binding Manual. (Compl. ¶¶ 14, 124–130.)

19. The high school class of 2022 is the only graduating class still in college denied the opportunity to play five seasons. The classes of 2016 through 2020 received a fifth season through COVID-era blanket waivers. The classes of 2023 and beyond receive five seasons under the new permanent rule. The NCAA also issued a blanket "Pavia Waiver" granting an additional season to athletes who had played at non-NCAA schools – but excluded Mr. Avila's class from that waiver as well. Meanwhile, the NCAA has allowed former professional athletes – paid hundreds of thousands or millions of dollars – to return to college without counting their professional seasons against them. (Compl. ¶¶ 130–142.)

20. Plaintiff has received offers and interest from several NCAA Division I schools that want him on their roster, have open roster spots for him, and are prepared to offer him substantial compensation – all contingent upon him being eligible for the 2026-27 season. But for the NCAA's arbitrary and unlawful exclusion of Mr. Avila from eligibility, he would be on an NCAA Division I roster. (Compl. ¶ 22.)

21. SLU wants Mr. Avila on its roster for the 2026-27 season and would compensate him through revenue sharing and NIL agreements. However, the NCAA's 15-player roster limit prevents SLU from adding Mr. Avila because SLU was required to finalize its roster while the

NCAA maintained its exclusion. Other Division I schools have also indicated they would roster Mr. Avila and compensate him if he is deemed eligible. (Compl. ¶¶ 22–24, 116, 149, 152–155.)

## III. LEGAL STANDARD

22. Missouri Rule of Civil Procedure 92.02(a) provides that a Court grant a temporary restraining order where "the party seeking relief demonstrates that immediate and irreparable injury, loss, or damage will result in the absence of relief."

23. When a party seeks preliminary injunctive relief, the circuit court must evaluate four factors: "(1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other interested parties; (3) the moving party is likely to prevail on the merits; and (4) the effect on the public interest." *Comprehensive Health of Planned Parenthood Great Plains v. State*, 729 S.W.3d 222, 225 (Mo. 2025).

24. "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue." *Comprehensive Health of Planned Parenthood Great Plains v. State*, 726 S.W.3d 716, 737 (Mo. Ct. App. 2025), *transfer denied* (Dec. 16, 2025).

25. Mr. Avila here seeks a prohibitive preliminary injunction – to enjoin the NCAA from rendering him ineligible for the 2026-27 season, to enjoin the NCAA from punishing member institutions for rostering Mr. Avila, and to enjoin the NCAA from enforcing roster limits to prevent Mr. Avila from playing for SLU. Even if this were a mandatory injunction – which it is not – the heightened clear-proof standard is similarly met. *ACLU of Mo. v. Ashcroft*, 577 S.W.3d 881, 897 (Mo. Ct. App. 2019) ("Mandatory injunction may be invoked to compel the undoing of something wrongfully done.").

26. Here, granting Mr. Avila eligibility would preserve the status quo that has existed since 2016 – and that continues under the current 2026-27 NCAA Manual's Five-in-Five Rule – in which virtually all athletes have received five or more seasons of competition.

## IV. <u>ARGUMENT</u>

### A. <u>Irreparable Harm</u>

27. Mr. Avila will suffer immediate and irreparable harm if the NCAA is not enjoined.

28. Missouri Rule of Civil Procedure 92.02(a) requires a showing that immediate and irreparable injury, loss, or damage will result in the absence of temporary relief. "Irreparable harm is established if monetary remedies cannot provide adequate compensation for improper conduct." *Minana v. Monroe*, 467 S.W.3d 901, 907 (Mo. Ct. App. 2015). Avila satisfies that requirement because the season at issue is finite, imminent, and cannot be recreated after it has passed.

29. Courts across the country, including here in Missouri, have found that student-athletes suffer irreparable harm when denied the opportunity to play sports. *See Dobson v. NCAA,* Case No. 26BA-CV05086 (Boone Cty., MO Sept. 18, 2026) (Temporary Restraining Order, attached hereto as <u>Exhibit B</u>); *Tatum v. NCAA*, 992 F. Supp. 1114, 1121 (E.D. Mo. 1998) (finding that a loss of a college athletics season "may constitute a significant harm due to the loss of one year of development and maturity in athletics as well as the benefits of participating with the team as it is presently composed"); *Adams et al. v. NCAA*, Case No. CV-2026-1757 (Tulsa Cty., Okla. Sept. 16, 2026) (Preliminary Injunction Order, attached hereto as <u>Exhibit C</u>**),** at p. 17 ("Plaintiffs' irreparable harm includes the loss of collegiate athletic seasons which are time-sensitive, cannot be replaced, and cannot be compensated with money. The loss of an athletic season represents the loss of an opportunity to develop skills and self-confidence, the opportunity to lead and to learn to be part of a team . . . ."); *Ganden v. NCAA,* No. 96 C 6953, 1996 U.S. Dist. LEXIS 17368, at *18

(N.D. Ill. Nov. 19, 1996) (elite swimmer "would lose an entire year or competition," which "is likely to inhibit his development as a swimmer during a critical point in his career" – but denying relief for lack of discrimination under § 12182(b)(2) of Title III); *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."). Mr. Avila faces exactly this harm – amplified by multiple overlapping forms of irreversible injury.

30. Mr. Avila's injury is not speculative. Mr. Avila is the reigning A-10 Player of the Year. SLU wants Mr. Avila on its roster if permitted to roster him; several other schools want to roster Mr. Avila for the 2026-27 season if eligible, and have open roster spots available for him. *See* attached as Exhibit F, the Declaration of Duncan Lloyd. Without relief, he will lose the opportunity to practice, compete, develop, obtain exposure, and pursue the educational, scholarship, NIL, and professional benefits associated with the 2026-27 season.

31. Absent an injunction, Mr. Avila will suffer multiple overlapping forms of irreversible injury. ***First***, he will permanently lose his fifth season – once the season begins without him, that opportunity is gone forever. ***Second***, he will lose unrecoverable NIL and revenue-sharing income tied to participation and visibility. Under *House v. NCAA*, No. 4:20-cv-03919-CW (N.D. Cal. June 6, 2025), schools can pay up to $20.5 million annually to athletes – but only to those who are eligible. Mr. Avila has many offers awaiting him for the 2026-27 season if deemed eligible. ***Third***, his professional trajectory will be impaired. NCAA Division I basketball is the exclusive pathway to the NBA; missing a season eliminates game film and scout exposure – a harm that is "incalculable." *Elad v. NCAA*, No. 25-1981, 2025 WL 1202014, at *9 (D.N.J. Apr. 4, 2025), *vacated and remanded on other grounds*, 160 F.4th 407 (3d Cir. 2025). NBA scouts have

expressed interest if he can further develop his skills this season. (Exh. F, Lloyd Decl. ¶¶ 10-12.) Further, his future earnings prospects from playing overseas are also diminished by the inability to further develop during the 2026-27 Division I season. (Exh. F, Lloyd Decl. ¶¶ 10-12). ***Fourth***, each day Mr. Avila is barred from practice and team activities results in irreparable harm. Missing preparation impacts an athlete's development, chemistry with teammates, and performance. *Ohio v. NCAA*, 706 F. Supp. 3d 583, 599 (N.D.W. Va. 2023); *Ganden*, 1996 U.S. Dist. LEXIS 17368, at *18. No court can return lost practice time or recreate the competitive experience of a Division I season.

32. A lost collegiate athletic season cannot be recreated after the fact. If Mr. Avila is prohibited from practicing and competing during the 2026-27 season, no subsequent monetary award can restore the actual games, practices, exposure, statistics, development, relationships, scholarship opportunities, or professional opportunities he would have received. As Missouri courts have explained, "injunctive relief should be granted when irreparable harm is otherwise likely to result." *Smith v. Western Electric Co.*, 643 S.W.2d 10, 13 (Mo. App. 1982).

33. The harm is especially substantial because Avila has already been denied the same opportunity given to athletes in other graduating classes. He spent substantial portions of his career competing against athletes in their fifth or sixth seasons of eligibility. He ultimately achieved great success – earning Atlantic 10 Player of the Year honors and leading SLU to the NCAA Tournament – and is now being denied the opportunity to continue competing based solely on his high school graduation year.

34. The harm is not merely monetary. Avila risks losing the opportunity to establish an athletic record, compete before professional scouts, obtain athletic recognition, develop NIL opportunities, and pursue potential professional basketball opportunities. He also risks losing

educational and scholarship-related opportunities associated with continued athletic participation. This Court found irreparable harm on nearly identical facts and granted a temporary restraining order in *Tettamble v. NCAA*, No. 2622-CC13295, Order (22d Jud. Cir. Sept. 1, 2026).

35. The injury is immediate because the 2026-27 athletic season is presently underway or imminent and roster decisions, practices, games, scholarships, and athletic opportunities occur on an accelerated schedule.

36. As set forth here, Mr. Avila also seeks a restraint of the NCAA's roster limit for the 2026-27 season. SLU's coaches have informed Mr. Avila and his representatives that they want him on the team for next season and have substantial compensation to offer Plaintiff, but SLU was required to finalize its roster for the 2026-27 season due to the NCAA's late and continued exclusion of Mr. Avila. The NCAA's 15-player roster limit is currently preventing Plaintiff from being added to SLU's roster – a prohibition and problem caused by the NCAA itself. Had the NCAA never excluded Mr. Avila's class from the Five-in-Five Rule, Mr. Avila would be on the SLU roster right now for the 2026-27 season. *See* attached as Exhibit D the declaration of Roberto Avila.

37. Other courts have restrained the NCAA from enforcing its roster limits to prohibit NCAA college basketball student athletes from playing at specific schools, which had already filled their rosters due to the NCAA's unlawful exclusion. *See Griffen v. NCAA*, Case No. 26-002713-CV-272 (Brazos Cty., TX, Sept. 14, 2026) (Order attached hereto as Exhibit E).

38. However, to be clear, there are several schools that want Mr. Avila to play for them next season if eligible, which have open roster spots available for him. Exh. F, Lloyd Decl.

**B. Balancing of Harm Weighs in Mr. Avila's Favor**

39. The balance of harms overwhelmingly favors Avila. "When considering whether to grant a preliminary injunction, the trial court must consider, among other factors, the balance between [any] harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties." *State ex rel. Ideker, Inc. v. Grate*, 437 S.W.3d 279, 287 (Mo. Ct. App. 2014).

40. Without an injunction, Avila will permanently lose an entire season of collegiate competition – his fifth and potentially final season. The NCAA, by contrast, will suffer no cognizable injury from permitting one additional athlete to participate while the case is pending. The NCAA has already voluntarily extended five seasons of eligibility to every other graduating class; permitting Avila to compete on the same terms imposes no burden the NCAA has not already accepted. Any administrative uncertainty can be addressed through records, conditions, and an expedited merits determination; Avila has no comparable remedy for a season that has already been lost.

41. Tens or hundreds of other class of 2022 graduates have been granted injunctive relief to play this season – and many of them are currently playing in the ongoing 2026-27 football season. The NCAA cannot identify any harm it has suffered.

42. The NCAA voluntarily changed its own rules to allow five seasons and has admitted that the prior four-season cap served no legitimate purpose for student-athletes. It cannot claim cognizable harm from an order that temporarily mirrors its own policy change and requires only that Avila be treated consistently with the written Manual. Courts across the country – including this Court in substantially identical proceedings – have found the balance of harms favors the student-athlete.

43. The NCAA similarly provided class-wide additional season waivers for COVID and the Pavia Waiver, yet the NCAA cannot identify a single harm to student athletes.

44. There is no danger of student athletes losing roster spots. There are schools with open roster spots that want Mr. Avila; and Mr. Avila seeks a restraint of the roster limit as it pertains to him to attend and play for SLU.

45. The requested order preserves rather than disrupts the status quo. It does not decide the ultimate merits, award Mr. Avila a championship or playing time, or prevent the NCAA from completing its administrative review. It simply prevents enforcement of a disputed eligibility determination while the Court considers the complete record.

**C. <u>Likelihood of Success on the Merits</u>**

46. To obtain a preliminary injunction, a party must show that it is "likely to prevail on the merits." *Comprehensive Health of Planned Parenthood Great Plains v. State*, 726 S.W.3d 716, 737 (Mo. Ct. App. 2025), *transfer denied* (Dec. 16, 2025) (more than "just a 'fair chance'"). Avila has shown clear proof that he is likely to succeed on the merits, on each of his claims.

*i. <u>Breach of Contract and Duty of Good Faith and Fair Dealing</u>*

47. The NCAA Manual, Constitutions, and Bylaws constitute a binding contract between the NCAA and its member institutions. Under Missouri law, "a third-party beneficiary is one who is not privy to a contract but may nonetheless pursue a cause of action for breach of contract." *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247, 260 (Mo. banc 2002); *Hilliker Corp. v. Watson Prop., LLC*, 667 S.W.3d 117 (Mo. Ct. App. 2022). "The beneficiary does not need to be named in the contract, but the terms of the agreement must clearly and directly express an intent to benefit an identifiable person or class." *Hilliker*, 667 S.W.3d 117; *see also L.A.C.*, 75 S.W.3d at 260.

48. The NCAA Constitution and Bylaws constitute binding contractual obligations among the NCAA and its member institutions. The NCAA's Constitution declares that the Association is "committed to the well-being and development of student-athletes" and mandates that athletics programs "shall be conducted . . . in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes." (Ex. 1 to Pet., NCAA Manual, Art. I, I-D, II-D) Bylaw 20.9.1.6 also requires that "[i]ntercollegiate athletics programs shall be conducted in a manner to enhance the well-being of student-athletes who choose to participate . . . ." (*Id.*, Bylaw 20.9.1.6). Student athletes are the identifiable class for whose benefit these agreements exist, making Avila an intended donee beneficiary rather than a merely incidental beneficiary. *See Hardware Ctr., Inc. v. Parkedge Corp.*, 618 S.W.2d 689 (Mo. Ct. App. 1981) (adopting Missouri's Restatement classification of donee, creditor, and incidental beneficiaries).

49. Courts around the country have held that student athletes are third party beneficiaries to the NCAA Manual. *See, e.g., Adams et al. v. NCAA*, Case No. CV-2026-1757 (Tulsa Cty., Okla. Sept. 16, 2026) (Preliminary Injunction Order, attached hereto as Exhibit C); *Osueke v. NCAA*, Case No. 2026-2341-3 (McLennan Cty., Tex. Sept. 22, 2026) (Temporary Injunction Order, attached hereto as Exhibit G).

50. Missouri recognizes that "the constitution, rules, and bylaws of an unincorporated association establish an enforceable contract between its members." *Executive Bd.* of *Mo. Baptist Convention v. Carnahan*, 170 S.W.3d 437, 446 (Mo. Ct. App. 2005). Those contractual obligations include the implied covenant of good faith and fair dealing; "Missouri law implies a covenant of good faith and fair dealing in every contract." *Rock Port Mkt., Inc. v. Affiliated Foods Midwest Coop., Inc.*, 532 S.W.3d 180, 188 (Mo. App. W.D. 2017). "A party breaches the covenant of good faith and fair dealing if it exercises a judgment conferred by the express terms of the agreement in

a manner that evades the spirit of the agreement and denies the other party the expected benefit of the agreement." *Id*.

51. The NCAA has materially breached the contract – and the implied covenant of good faith and fair dealing – through multiple courses of conduct. ***First***, by arbitrarily excluding Mr. Avila from competing in the 2026-27 season while granting five seasons to every class before and after him, the NCAA violated its express textual commitments to fairness and opportunity. (Ex. 1 to Compl., NCAA Manual Art. 1-C.) ***Second***, the NCAA breached the implied covenant of good faith and fair dealing by exercising its judgment and rulemaking ability to require Mr. Avila to compete against athletes who were playing their fifth season, or more, yet arbitrarily excluded him and only his class from the permanent five season rule. The NCAA offered no reasoned basis for this exclusion – and has admitted there are no contemporaneous minutes or documents that reflect any reasoned analysis or decision-making behind the exclusion. ***Third***, the 2026-27 NCAA Manual provides all athletes with five seasons of competition – which Mr. Avila would qualify for, but for a purported issued "guidance" that excludes Mr. Avila and his class. That is a direct breach of Bylaw 12.6 of the 2026-27 NCAA Manual.

52. The NCAA Manual's text controls. "The judicial interpretation of an organization's constitution and bylaws, including whether they are ambiguous, presents legal questions to be resolved by the text of the documents," and "if the language of a voluntary association's bylaws is unambiguous, it will be enforced according to its plain language." 6 Am. Jur. 2d Associations and Clubs § 6. The 2026-27 NCAA Manual provides five seasons of eligibility for all student-athletes and contains no written exclusion for the class of 2022. The NCAA cannot enforce an extra-textual exclusion that does not appear in the governing Manual.

53. In the most recent case on this issue, the state court in Indiana, in *Daley et al. v. NCAA* (Exhibit A) held that the NCAA breached both the 2025-26 Manual and the 2026-27 Manual, in excluding class of 2022 student athletes. There is no difference here.

54. The NCAA has unsuccessfully argued around the country that courts must defer to its eligibility rules because it is a purported "voluntary" association. Missouri law does provide deference, but it also recognizes four exceptions: "(1) whether there are inconsistencies between the association's charter and bylaws and any action taken in respect to them; (2) whether the member has been treated unfairly, i.e., denied notice, hearing, or an opportunity to defend; (3) whether the association undertakings were prompted by malice, fraud or collusion; and (4) whether the charter or bylaws contravene public policy or law." *State ex rel. Missouri State High Sch. Activities Ass'n v. Schoenlaub*, 507 S.W.2d 354, 357 (Mo. banc 1974); *Drury v. Missouri Youth Soccer Ass'n, Inc.*, 259 S.W.3d 558 (Mo. Ct. App. 2008).

55. The deference doctrine is not a license to disregard the association's own rules or Missouri law. As the Missouri Court of Appeals explained, "while courts give deference to the quasi-judicial actions of voluntary associations, such associations are not free to violate the law of the land or transcend the limits of natural justice or the public policy of the state." *Drury*, 259 S.W.3d at 558.

56. At the outset, **the NCAA's exclusion is not a "quasi-judicial action,"** and therefore no deference is warranted. The exclusion was a blanket rulemaking decision – not an adjudicative determination made after notice and an opportunity to be heard. Further, the NCAA is not a "voluntary" association by any practical measure: it is the *sole* pathway to Division I collegiate athletics and, for basketball players, the exclusive developmental pipeline to the NBA.

Student-athletes like Avila have no meaningful alternative. No deference is warranted on that basis either.

57. Even if the deference doctrine were applicable here, Mr. Avila's claims trigger at least two exceptions: the NCAA's exclusion of the class of 2022 is inconsistent with the plain language and obligations of both the 2025-26 and 2026-27 NCAA Manuals, and enforcing that exclusion interferes with rights and public policy protected by Mo. Rev. Stat. § 173.280. The NCAA has also applied its eligibility rules inconsistently – granting five seasons to classes before and after 2022, and granting eligibility to former professional athletes – while denying the same opportunity to the class of 2022 based solely on high school graduation year.

58. The *Schoenlaub* framework is particularly important where students are not members of an athletic association and yet must rely upon it for the opportunity to play collegiate sports. The NCAA's control over Avila's eligibility, roster access, and participation therefore cannot foreclose judicial review where the challenged action allegedly violates the Manual and Missouri law. *See State ex rel. Missouri State High Sch. Activities Ass'n v. Schoenlaub*, 507 S.W.2d at 357; *Mabins v. Missouri State High Sch. Activities Ass'n by & through Bd. of Directors*, 732 S.W.3d 169 (Mo. Ct. App. 2026) (recording that a Missouri circuit court granted a preliminary injunction prohibiting the association from treating the student as ineligible during his senior season).

59. By making the five-season rule permanent while arbitrarily excluding Mr. Avila and the high-school class of 2022, the NCAA violated its contractual commitment to "fairness," "opportunity," and "ethical conduct," (Ex. 1 to Compl., NCAA Manual, Art. I-C, I-D.), as well as its implied covenant of good faith and fair dealing. Mr. Avila is likely to succeed on the merits of his breach of contract claim.

*ii.* *Violation of Missouri Antitrust Law*

60. The Missouri Antitrust Law prohibits "contracts, combinations, and conspiracies that unreasonably restrain trade or commerce within the State of Missouri." Mo. Rev. Stat. § 416.031. The statute "shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." Mo. Rev. Stat. § 416.141. The United States Supreme Court has recognized the *NCAA* as a "sprawling enterprise" whose eligibility rules operate in a commercial market. *NCAA v. Alston*, 594 U.S. 69, 79 (2021). And federal courts have found similar eligibility restrictions likely to violate the Sherman Act. *Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024). Avila's claim is therefore supported by both Missouri statutory text and comparable federal antitrust principles.

61. The NCAA is engaged in interstate and intrastate commerce involving the organization, regulation, marketing, promotion, and commercial exploitation of intercollegiate athletics. NCAA Division I basketball constitutes a substantial commercial market in which student-athletes provide athletic services, universities compete for athletic talent, conferences compete for athletic and media revenues, and third parties compete for NIL, sponsorship, marketing, broadcasting, and related commercial opportunities. The NCAA exercises substantial control over Division I basketball.

62. The NCAA's eligibility rules, enforcement mechanisms, waiver procedures, and restrictions on student-athlete participation constitute restraints upon competition. The NCAA's denial of Avila's eligibility, notwithstanding the NCAA permitting all surrounding graduating classes (and all going forward) five seasons of competition, and notwithstanding Avila's relationship with SLU and SLU's interest in his continued participation, restrains his ability to provide athletic services and restrains SLU's ability to compete using his services. The NCAA's

conduct also restricts Avila's ability to participate in the economic market associated with NIL compensation, athletic reputation, exposure, professional development, and other commercial opportunities. The challenged restraint is unreasonable because the NCAA used its regulatory authority to exclude Avila from a market the NCAA itself controls.

63. The Defendants' concerted conduct is a group boycott, and has the purpose or effect of restricting his access to that market and depriving him of the ability to compete for athletic, educational, NIL, and professional opportunities. Avila has suffered and continues to suffer injury to his business and property interests as a direct and proximate result of the NCAA's anticompetitive conduct. The NCAA has no procompetitive justification, as it has conceded that five seasons of competition is in the best interests of student athletes.

*iii. Violation of Missouri Student-Athlete NIL Rights (§ 173.280)*

64. Missouri's Student Athlete Compensation Act expressly protects a student-athlete's ability to participate and earn NIL compensation. Mo. Rev. Stat. § 173.280 prohibits an athletic association from preventing a student-athlete from "fully participating in intercollegiate athletics without penalty and earning compensation as a result of the use of the student's name, image, likeness rights, or athletic reputation." The statute also provides that "[a]ny student athlete may bring a civil action against third parties that violate this section or that interfere with such student athlete's earning or attempting to earn compensation," authorizing injunctive relief or actual damages. Mo. Rev. Stat. § 173.280(11)(1). The NCAA's denial of eligibility directly interferes with Avila's ability to participate and to earn time-sensitive NIL compensation.

*iv. Tortious Interference with Contractual Relationships and Business Expectancy*

65. Mr. Avila is also likely to succeed on his claims for tortious interference with contractual relationships (Count V) and tortious interference with business expectancies (Count

VI). Mr. Avila maintained contractual relationships with SLU concerning his enrollment, athletic participation, scholarship, revenue-sharing, and NIL opportunities for the 2026-27 season. Mr. Avila has several schools that want to roster him and enter into NIL and revenue share agreements with him – if eligible. *See* Exhibit F, Lloyd Decl. Defendants knew of these relationships and expectancies. The NCAA's enforcement of its eligibility determination and roster-limit restrictions directly and intentionally interfered with those relationships and expectancies. The interference was independently wrongful because it violated Missouri statutory rights under § 173.280, breached the NCAA Manual and the implied duty of good faith and fair dealing, and constituted unlawful restraints upon trade and commerce under Missouri antitrust law. Mr. Avila has been harmed as a result of the NCAA's tortious interference.

**D. Public Interest**

66. The public interest strongly favors the requested relief. There is a public interest in allowing student-athletes to participate in intercollegiate competition and in preventing eligibility from being denied based on unfair, arbitrary, and inequitable reasons. The *Tettamble* court expressly found: "There is a public interest in allowing student-athletes to participate in four (4) years of intercollegiate competition and in preventing student-athlete eligibility from being denied based on unfair, arbitrary, and inequitable reasons." *Tettamble v. NCAA*, No. 2622-CC13295, Order (22d Jud. Cir. Sept. 1, 2026). That interest applies with even greater force here, where the NCAA itself has recognized that five seasons – not four – is the appropriate standard.

67. The public has a substantial interest in ensuring that student-athletes are treated fairly and that eligibility determinations are based on governing rules rather than informal guidance that contradicts the Manual's plain text. The public also benefits when an association with extensive control over collegiate athletics applies its rules consistently and transparently.

68. Missouri has enacted specific statutory protections reflecting this public policy, particularly Mo. Rev. Stat. § 173.280, which protects student-athletes' ability to participate in intercollegiate athletics and earn compensation from their name, image, likeness rights, or athletic reputation. Courts across the country have likewise recognized that the public interest favors preserving student-athlete participation while eligibility disputes are resolved.

69. Avila's circumstances are particularly compelling because he did not abandon athletics. He competed every year, achieved excellence, remains within his five-year eligibility clock, and is being denied only because of his graduation year. Allowing him to compete while the eligibility dispute and administrative appeal are resolved advances rather than harms the public interest.

70. The requested relief also protects lawful competition and Missouri's interest in preventing a private athletic association from enforcing an unwritten restriction that conflicts with its own published rules and state law. The public interest therefore supports preserving Avila's opportunity to participate pending a prompt determination on the merits.

## V. <u>THE REQUESTED ORDER IS NARROWLY TAILORED</u>

71. Avila does not request a championship, starting position, scholarship, or any particular amount of playing time. He requests only the opportunity to practice, train, receive athletics-related benefits, maintain a roster position, and compete if otherwise selected and permitted under ordinary team rules.

72. Avila's principal request is prohibitory: that the NCAA be temporarily prevented from enforcing its exclusion of the class of 2022 or taking adverse action based on the disputed eligibility determination. This relief preserves the status quo pending an expedited hearing rather than requiring the Court to administer collegiate athletics.

73. He further requests that the NCAA grant Saint Louis University an exception to the 15-player roster limit so that he may be added to the roster for the 2026-27 season. That ancillary relief is necessary to preserve Mr. Avila's opportunity to play at SLU specifically, because the NCAA's roster limit is presently preventing SLU from carrying out its stated intent to roster Avila. However, even absent the roster-limit restraint, the eligibility relief independently benefits Mr. Avila: several other Division I schools want him on their rosters, have open roster spots available for him, and are prepared to compensate him – contingent only upon a determination of eligibility. (Exh. F, Lloyd Decl.)

74. A mandatory injunction directing the undoing of that which has been done may not be granted on doubtful proof; "the mandatory injunction is a harsh remedy, to be granted only when the right thereto is clearly established." *Minton v. Steakley*, 466 S.W.2d 441, 443 (Mo. App. 1971). That principle does not bar the relief requested here. Mr. Avila's request is not a mandatory injunction in substance: it principally seeks to prevent the NCAA from enforcing a disputed eligibility determination and to preserve the existing opportunity to compete. The requested order is therefore prohibitory in nature, while any roster-limit direction is ancillary to preserving that status quo.

75. Avila is willing to comply with all ordinary academic, medical, institutional, and athletic requirements applicable to similarly situated student-athletes at Saint Louis University. The requested relief does not exempt him from those requirements.

## VI. SECURITY BOND

76. Avila requests that the Court set security in the range of $100 to $500 under Rule 92.02, consistent with recent orders in substantially identical eligibility proceedings in this

jurisdiction. A bond within that range is adequate to address any cognizable injury while remaining proportionate to the status-quo relief requested.

77. The Tettamble court set a $500 bond, and the Gee court set a $100 bond, in substantially identical proceedings in the Twenty-Second Judicial Circuit. *Tettamble v. NCAA*, No. 2622-CC13295, Order (22d Jud. Cir. Sept. 1, 2026); *Gee v. NCAA*, No. 2622-CC13351, Order (22d Jud. Cir. Sept. 11, 2026). Avila is willing to post security in an amount within that range or such other reasonable amount as the Court determines appropriate.

## VII. REQUEST FOR EMERGENCY RELIEF

78. The circumstances justify emergency relief.

79. Avila's eligibility and roster status must be resolved before the 2026-27 athletic season progresses further. Delay will cause him to miss practices, conditioning, team activities, games, evaluation opportunities, and potentially the entire competitive season.

80. The passage of time therefore creates harm that cannot be repaired by a later judgment.

81. Avila respectfully requests that the Court issue an immediate Temporary Restraining Order enjoining enforcement of the NCAA's eligibility denial, ordering the NCAA to grant a roster limit exception, and set the matter for an expedited preliminary-injunction hearing while his formal NCAA appeal remains pending.

82. The Verified Complaint asserts nine causes of action, including breach of contract as a third-party beneficiary, breach of the implied covenant of good faith and fair dealing, violation of the Missouri Antitrust Law (§ 416.031 RSMo), violation of the Missouri Student Athlete Compensation Act (§ 173.280 RSMo), tortious interference with contractual relationships, tortious

interference with business expectancies, declaratory judgment, injunctive relief, and unjust enrichment. Each independently supports emergency relief.

83. The urgency of relief is further compounded by the NCAA's Rule of Restitution (Bylaw 12.9.4.2) and Ghost Transfer penalties, which threaten severe institutional sanctions if Avila competes pursuant to a court order that is later vacated. These enforcement mechanisms effectively deter institutions from rostering Avila and render judicial relief meaningless absent an order specifically enjoining their application.

## VIII. CONCLUSION

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an Order temporarily restraining and enjoining Defendants – including the NCAA, and any entities, divisions, persons or agents acting on its behalf, and the individual Defendants named herein in their official capacities – from enforcing the exclusion of the high school class of 2022 from the five-season eligibility framework as against Mr. Avila during the 2026-27 athletic season, and specifically:

1. Restraining and enjoining the NCAA from enforcing its rules, regulations, guidance, interpretations and/or bylaws, including but not limited to NCAA Bylaw 12.6, the four-season cap, the exclusion of the high-school class of 2022, or any other bylaw, to prevent or preclude Mr. Avila from having at least one more season of eligibility playing NCAA Division I basketball in the 2026-27 season;
2. Restraining and enjoining the NCAA from applying its roster limits in a manner that would foreclose Mr. Avila's opportunity to compete at SLU, or any member institution, for the 2026-27 season;
3. Restraining and enjoining the NCAA from enforcing Bylaw 12.9.4.2 (the Rule of Restitution) or any "Ghost Transfer" penalty rules against Mr. Avila, any other NCAA

member institution for which Mr. Avila may compete in 2026-27, or any institution that competes against Mr. Avila in the 2026-27 basketball season;

4. directing the NCAA to certify Mr. Avila as eligible for the 2026-27 season immediately or within such other reasonable time frame as this Court may set;
5. Setting an expedited hearing on Plaintiff's request for preliminary injunction; and
6. Awarding such other and further relief as this Court deems just and proper.

Dated: September 24, 2026

Respectfully submitted,

/s/*Andrew W. Blackwell*
Andrew Blackwell, #64734
**BLITZ, BARDGETT & DEUTSCH, L.C.**
120 S. Central Avenue, Ste. 1500
St. Louis, Missouri 63105
(314) 863-1500
ablackwell@bbdlc.com

AJ Rudowitz, Esq. (*pro hac vice application forthcoming*)
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103
T: (215) 979-1974
E: AJRudowitz@duanemorris.com

*Attorneys for Plaintiff Roberto Avila*